# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| CARL MARTIN, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | )    Case No. 3:21-cv-00277 |
| | )    Judge Aleta A. Trauger |
| LIBERTY INSURANCE | ) |
| CORPORATION, | ) |
| | ) |
|    Defendant. | ) |

## <u>MEMORANDUM</u>

Before the court is the Motion for Summary Judgment filed by defendant Liberty Insurance

Corporation ("Liberty"). (Doc. No. 16.) For the reasons set forth herein, the motion will be granted.

## I.    FACTS AND PROCEDURAL HISTORY

Plaintiff Carl Martin has owned the single-family dwelling located at 1606 22nd Avenue

North, Nashville, Tennessee 37208 (the "Property") since July 2016, when he was awarded

ownership of the Property from the Wess B. Martin Trust, as a result of a lawsuit filed in Davidson

County Circuit Court, Probate Division.[1] The Property has been used as a rental property at all

---

[1] The facts for which no citation is provided are derived from the plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Doc. No. 21) or the defendant's Response to Plaintiff's Statement of Additional Facts (Doc. No. 24). Unless otherwise indicated, the facts recited herein are undisputed for purposes of the Motion for Summary Judgment.

The court also observes that the parties have made locating their cited exhibits exceedingly and unnecessarily difficult by, for instance, referring to declarations and other exhibits by their exhibit number rather than by referencing the actual title or even the docket number of the exhibit (for instance, "Ex. 4 at ¶ 14" rather than "McKeon Decl. ¶ 14"). The court discourages this practice generally, but in this case the problem is compounded by the fact that sub-exhibits (exhibits to exhibits) are also referenced by number (*e.g.*, "Ex. 1, Ex. 7," which apparently means Exhibit 7 to Exhibit 1).

times relevant to this dispute. This case arises from Liberty's denial of Martin's claim for insurance coverage of damage to the Property that occurred when a tornado struck it on March 3, 2020.

Liberty issued a homeowners insurance policy, Policy No. H37-258-122522-70 9 9 ("Policy"), providing coverage for the Property beginning on August 5, 2016, and it renewed the Policy on a yearly basis thereafter, on August 5, 2017, August 5, 2018, and August 5, 2019. Prior to the last renewal, on July 2, 2019, Liberty sent Carl Martin a renewal premium notice related to the Policy, providing notice that the premium due for the policy period of August 5, 2019 through August 5, 2020 would be $770. Martin called Liberty on July 17, 2019 to discuss the amount by which the premium had increased, compared to the previous year's premium.

Liberty keeps contemporaneous notes regarding all telephone contacts with the plaintiff regarding the Policy in its "Customer Service Workbench" or "CSW." (Williams Decl. ¶ 13.) Its notes reflect that, on July 22, 2019, Keith Williams, a Rewrite Specialist for Liberty, spoke with a person who identified himself as the policyholder of the Policy and who advised Williams that the Property was vacant. (Doc. No. 16-9, Williams Decl. ¶¶ 8–11; Doc. No. 16-9, at 72; Doc. No. 16-8, McKeon Decl. ¶ 13.) The plaintiff disputes that assertion, citing to his own deposition testimony. The referenced testimony tends to establish only that the plaintiff was confused about the timeline of events and did not specifically remember a telephone call that occurred on July 22, 2019, and he never clearly denied telling Liberty that the Property was vacant. The cited testimony reads in relevant part as follows:

> Q.     Okay. Let's go to the next page, LIC66. The bottom entry says: On July 22, 2019, you called stating that the home is vacant. Do you recall making a call to Liberty Mutual on July 22nd, 2019, to state that the rental home was vacant?
>
> A.     I told – I called them – I'm having plumbing work done that Evelyn [McCarty] could not be in the house until the plumbing work is finished.
>
> And the woman, she asked me, she said, how long do you think it will take? I said, I don't know. Two to three, maybe four days, five days . . .

Q.      We talked about that phone call. Do you know if that phone call happened in July of 2019 or sometime earlier?

A.      It might be early. I can't remember.[2]

Q.      I'll tell you, our records show that this phone call on July 22nd, 2019, occurred with a gentleman named Keith Williams, so it should have been a male voice you heard on the phone rather than a female voice.

Do you remember talking to a male Liberty Mutual representative and having the discussion about the plumbing situation?

A.      I might have.

Q.      Do you remember telling anyone at Liberty Mutual in July of 2019 that this home was vacant?

A.      *I told them that the woman cannot live in the house. She going to mov[e] next door.*

(Doc. No. 20-9, Martin Dep. 88–89 (emphasis added).)[3]

In any event, Keith Williams testified that his practice, whenever a policyholder informs him that a property is vacant, is to reconfirm with the policyholder that the property is, indeed, vacant. (Williams Decl. ¶ 13.) Once he confirms the information, he enters it into the CSW system and sends an email to "Dover Loss advising that the policyholder informed [him] that the insured property associated with the Liberty policy at issue is vacant." (Williams Decl. ¶ 13.) According to Williams, he did this in Martin's case. (Williams Decl. ¶ 14; McKeon Decl. ¶ 14.) After he advised Dover Loss that the policyholder told him the Property was vacant, Williams's role in the

---

[2] According to the Declaration prepared by Evelyn McCarty, the plaintiff's tenant who was living at the Property at all relevant times, extensive plumbing repairs were done to the Property in October 2018, which took "2–3 days on one occasion, and 2–3 days on a second occasion," during which she continued to reside at the Property but stayed at a neighbor's house for a few nights. (Doc. No. 20-8, McCarty Decl. ¶¶ 3–4.) It is therefore unclear why the plaintiff would have discussed this event with a Liberty representative in July 2019.

[3] The parties submitted multiple excerpts from multiple deposition transcripts. The court attempts to identify where in the docket the specific excerpt cited can be located but will refer to the deposition transcripts by their original pagination.

process ended, though he was "generally aware that vacancy may lead to a cancellation of the policy." (Williams Decl. ¶ 15.)

According to Liberty, Liberty's underwriting department decided to cancel the Policy after receiving the information from Williams that the Property was vacant, based on the determination that "the vacancy created a substantial change in risk to the insured property." (McKeon Decl. ¶ 15.) The plaintiff does not dispute, as a factual matter, that Liberty decided to cancel the Policy based on Keith Williams' notes from the July 22, 2019 call, but he denies telling Williams that the Property was vacant, denies that the Property was ever vacant, and denies that a substantial change in risk actually occurred, because the Property was never vacant. (Doc. No. 21, at 4 (Pl.'s Resp. to Def.'s Statement of Undisp. Fact No. 9).)

On July 30, 2019, Liberty sent written notice of cancellation of the Policy to Martin's primary address, advising him that the Policy would be cancelled effective September 4, 2019, because Liberty had been informed that the Property was vacant. The plaintiff called Liberty on July 31, 2019. Liberty's call notes reflect that, during that telephone call, the plaintiff was informed that his Policy was due to be cancelled because of the Property's being vacant and that the plaintiff stated that the home was "now occupied." (Doc. No. 16-2, at 5.) In his deposition, the plaintiff stated that he remembered calling Liberty to complain about the premium being too high, but he did not recall being told during that phone call that the Policy was going to be cancelled, and he denied that the Property was ever vacant. (Doc. No. 20-9, Martin Dep. 95–96.)

Liberty alleges that it advised the plaintiff on July 31, 2019 (and again on August 14 and August 19, 2019) that it would reconsider its decision to cancel the Policy if Martin provided proof that the Property was occupied. (Doc. No. 16-2, at 5, 4.) The plaintiff denies that this occurred, but his deposition testimony reflects that he was told that Liberty needed proof of occupation—he

simply maintains that he provided it. (Doc. No. 20-9, Martin Dep. 96 (in response to the question of whether he remembered Liberty asking him for "proof that the home was occupied – current utility bills, et cetera, from the tenant," the plaintiff answered "Liberty Mutual have all that"); *id.* at 97 ("Q. Do you remember them asking for that in July of 2019? A. Evelyn send them that information. And they have that information."); *id.* at 97–98 ("Q. Okay. Do you recall somebody at Liberty Mutual asked you for the water bill? A. Right."); *id.* at 106–07 ("Q. Do you remember when you spoke with this lady at Liberty Mutual that she told you we need two utility bills and the lease? A. All I remember is she just said she need the water bill. And I asked her, I said, why y'all need a lease? And she said, y'all not written from me [sic]. So I went ahead and mailed it to them."); *id.* at 107 ("[They told me] [w]e just want to make sure that someone is living in the house. I said, okay. And I done what they asked me to do.").) The plaintiff then states that he does not dispute, for purposes of summary judgment, that Liberty requested a water bill and a copy of the lease. (Doc. No. 21, at 6 (Pl.'s Resp. to Statement of Undisp. Fact No. 15).)

Liberty's records reflect that Martin informed Liberty on August 19, 2019 that he would not provide the requested documents because his attorney told him "he is not required to send that to us." (McKeon Decl. ¶ 23; Doc. No. 16-2, at 4.) The plaintiff denies that he made such a statement. (*See* Doc. No. 20-9, Martin Dep. 110 ("I asked them, why y'all need a lease? And I went on and sent it to them.").)

On August 1, 2019, Martin paid the entire annual premium, $770, to renew the Policy for the period of August 5, 2019 to August 5, 2020. On August 5, 2019, Liberty issued the Policy that purported to provide certain coverage for the Property for a period of August 5, 2019 to August 5, 2020. The Policy correctly identified Carl Martin as the named insured, his mailing address, and the insured location.

The Policy in effect from August 5, 2018 through August 5, 2019 and the Policy in effect beginning August 5, 2019 both contain identical provisions pertaining to "concealment or fraud," as follows:

> **2. Concealment or Fraud.** The entire policy will be void if, whether before or after a loss, an "insured" has:
>
> a. Intentionally concealed or misrepresented any material fact or circumstance;
>
> b. Engaged in fraudulent conduct; or
>
> c. Made false statements; relating to this insurance. . . .

(Policy, Doc. No. 1-1, at 45.)

The Policy further permits cancellation of the Policy by Liberty under limited circumstances, as follows:

> We [Liberty] may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address shown in the Declarations. Proof of mailing will be sufficient proof of notice.
>
> (1) When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.
>
> (2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.
>
> (3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:
>
> (a) If there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or
>
> *(b) If the risk has changed substantially since the policy was issued.*
>
> *This can be done by letting you know at least 30 days before the date cancellation takes effect.*

(Policy, Doc. No. 1-1, at 45–46 (emphasis added).)

The Policy also permitted Liberty to refuse to renew the Policy under certain circumstances:

> **6. Nonrenewal.** We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Declarations, written notice at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice.

(Policy, Doc. No. 1-1, at 46.)

On July 30, 2019, Liberty mailed to the mailing address listed for Martin on the Policy a letter notifying him that the Policy would be cancelled on September 4, 2019 and stating that the "reason for cancellation" was:

- Change in risk which substantially increases the hazards insured against

Underwriting Comments
Home is no longer occupied

(Doc. No. 16-8, at 83.) The plaintiff concedes that Liberty has presented proof of a mailing on that date.

According to Devin McKeon, a Senior Compliance Analyst for Liberty, Liberty received notice on July 22, 2019 that the Property was vacant and decided on the same date to cancel the Policy. (McKeon Decl. ¶¶ 2, 16.) However, "since the Policy required thirty (30) days' prior notice of cancellation, Liberty set the Policy's cancellation to be effective on September 4, 2019." (*Id.* ¶ 16.) According to McKeon, if Martin had notified Liberty prior to July 2, 2019 that the Property was vacant, Liberty would have elected not to renew the Policy. (*Id.* ¶ 17.)

On September 6, 2019, Liberty refunded the unused portion of the plaintiff's premium payment, in the amount of $707, to the checking account from which the plaintiff had paid the premium. The plaintiff now acknowledges that $707 was deposited into his checking account on September 6, 2019, and he admits withdrawing $700 in cash from the same checking account on October 21, 2019. He admits receiving bank statements from SunTrust bank (Doc. No. 16-1,

Martin Dep. 121), and his statement dated September 30, 2019 reflects an electronic credit in the amount of $707 from Liberty Mutual (Doc. No. 16-2, at 43). Martin testified that, although he saw that $707 had been deposited into his account, he "didn't [know] where it came from." (Doc. No. 20-9, Martin Dep. 121.) He claims not to have known that Liberty had refunded his premium until after the tornado struck, because he does not frequently check the account to which the premium was refunded. (*Id.* at 122 ("I didn't know it was put back in there. . . . Until after the tornado. I didn't know. I don't check that checking account.").)

In the very early hours of March 3, 2020, a tornado struck north Nashville and caused severe damage to the Property. Martin called Liberty to report the damage (the "Loss") later the same day. During that telephone call, Liberty notified Martin that there was no Policy in effect at the time of the Loss. The plaintiff had not purchased other insurance coverage for the Property.

On June 5, 2020, Martin filed a Complaint with the Tennessee Department of Insurance and Commerce ("Department of Insurance Complaint"). In a signed letter attached to his Department of Insurance Complaint, Martin claimed, among other things, the following:

- "Apparently, Liberty just cancelled this policy without notice to me by placing the amount of premium back in my business bank account (verified with my bank after the loss and contact with Liberty)."

- Liberty had "demanded a copy of my lease with my tenant, but since I had no written lease at that time, I didn't give it to them."

- "I have had a renter in the [Property] at all times the insurance was in place, unless repairs were being actively made, so Liberty has had no excess exposure on this policy."

(Doc. No. 16-2, at 64.)

In a letter to plaintiff's counsel dated January 12, 2021, Liberty reiterated the basis for its denial of the plaintiff's claim as follows:

No later than July 17, 2019, Mr. Martin called to discuss a Liberty homeowners insurance policy renewal notice timely sent to him earlier that month with regard

to the Property, which contained a premium increase from the $656.00 charged for the previous policy period. During a subsequent phone call occurring on July 22, 2019, Mr. Martin informed Liberty that the Property was vacant. Based upon Mr. Martin's statement that the Property was vacant, Liberty advised Mr. Martin that the Policy would be cancelled because of the substantial changes in risks that the Policy insured against with respect to the Property. In addition to several telephone calls about the cancellation between Liberty and Mr. Martin, on July 30, 2019, Liberty sent written correspondence via certified mail to Mr. Martin's home address of 2807 Saint Edwards Drive, Nashville, Tennessee 37211, through which Liberty advised Mr. Martin that the Policy would be cancelled on September 4, 2019.

During subsequent telephone calls in August of 2019, Liberty advised Mr. Martin that it would reconsider its decision to cancel the Policy despite Mr. Martin's earlier declaration that the Property was vacant, in the event Mr. Martin produced two (2) months of utility bills related to the Property and a signed lease with regard to the Property. On August 19, 2019, Mr. Martin informed Liberty that he refused to comply with Liberty's request for such information. No such information was ever produced to Liberty by Mr. Martin or his counsel until after the Alleged Loss.

Thereafter, the Policy was cancelled effective September 4, 2019. As a consequence, on September 4, 2019, the bank account through which Mr. Martin made his previous premium payments with respect to the Policy was credited with the unused portion of the Policy's premium: $707.00. On September 5, 2019, Liberty also advised Mr. Martin of the $707.00 refund via email.

(Doc. No. 16-8, at 106.) The plaintiff does not dispute that Liberty's legal theories were articulated in this letter, but he disputes the validity of Liberty's demands for proof of occupancy and the validity of its legal theories. Moreover, the plaintiff does not have an email address.

Although the plaintiff claimed in his Department of Insurance Complaint that he did not have a written lease, in his deposition, as set forth above, he testified that he had a lease and that he sent it to Liberty. In the course of this dispute, he has produced a single-page lease with Evelyn McCarty dated March 15, 2019. (Doc. No. 16-8, at 99.) Although he claims to have mailed a copy of the lease to Liberty, Martin has not provided proof of mailing. It is undisputed for purposes of the Motion for Summary Judgment that Liberty did not receive a copy of the lease prior to the cancellation of the Policy on September 4, 2019. It appears that it did not receive a copy of the lease until sometime during this litigation.

In his Statement of Additional Facts, the plaintiff points out that Liberty did not require proof of occupancy when it first issued the Policy covering the Property in 2016, and it never inquired whether the Property was occupied at any time while the Policy was in effect. The plaintiff also points to the testimony of Devin McKeon, in his capacity as Liberty's Rule 30(b)(6) witness, that a "significant change in risk," as referenced in Liberty's underwriting guidelines in effect in July and August 2019, means there is "actually a significant change" in risk, such as a different type of use for the property or vacancy. (Doc. No. 20-12, McKeon Dep. 12–13; *see id.* at 27 ("Q. All right. And can we agree that this paragraph (b) says, If the risk has changed substantially. It doesn't say if we think the risk has changed substantially. Rather [] it says that the risk has changed substantially. You agree with me? A. Yep, correct."); *see also* Policy, Doc. No. 1-1, at 46.) It is undisputed that Evelyn McCarty occupied the Property at all times from approximately 2000 until the tornado hit the Property on March 3, 2020.

Jim Mahurin, an expert proffered by Liberty, testified to his opinions that Liberty followed its "normal underwriting and cancellation procedures and returned the unearned premium" (Doc. No. 16-10, Mahurin Dep. 67); that the plaintiff's statement that the Property was vacant, even though it was not actually vacant, "automatically triggered" Liberty's "response in terms of how they deal with vacant property" (*id.* at 38); that, when an insured claims that property is not vacant, "a change from vacancy to occupancy requires additional information" and "independent verification" (*id.* at 49). He also testified that it is common in the industry when dealing with issues of vacant property for an insurance company to send notice of cancellation and, in some cases, to "tell the insured that if they follow certain criteria and meet certain criteria that they can continue the policy with a vacancy waiver, but that costs an additional premium." (*Id.* at 69.) According to Mahurin, Liberty's process in cancelling Martin's Policy was "consistent with—if not in excess

of—industry practices regarding vacant property," insofar as Liberty had multiple conversations with Martin "about the issue of vacancy on the Property" and referred him "to a service team that reached out to him specifically to help him with the matter." (*Id.* at 67–68.)

For his part, the plaintiff denies that Mahurin's "interpretation of Liberty Mutual's compliance with [its] own underwriting manual . . . is accurate," pointing out that the section of Liberty's Underwriting Guidelines describing the documentation required from an owner in response to a vacancy only applies to "New Business/Non-Renewal Inspection Cancellations." (*See* Doc. No. 20-13, at 3; *see also* Doc. No. 20-12, McKeon Dep. 13–15; Doc. No. 20-14, Mahurin Dep. 62–63.) The plaintiff maintains that this provision has no application to his situation, because his Policy was not new, and it was not non-renewed. The plaintiff also, again, denies that he ever actually told Liberty that the Property was vacant other than briefly during repair periods. (Doc. No. 20-9, Martin Dep. 88–90.) The plaintiff denies that Liberty complied with the terms of the Policy in cancelling it, because the Property was never vacant.

The plaintiff filed suit against Liberty in state court on February 26, 2021. Liberty removed the case to federal court on April 4, 2021 on the basis of diversity jurisdiction. In his Complaint, the plaintiff asserts claims for: (1) breach of contract, based on Liberty's denial of his claim; (2) breach of contract, based on improper cancellation; and (3) bad faith refusal to pay a valid claim, under Tenn. Code Ann. § 56-7-105. The defendant has now filed its Motion for Summary Judgment, along with a supporting Memorandum of Law, Statement of Undisputed Facts, and various deposition excerpts, declarations, and documentary evidence. (Doc. Nos. 16–18.) The plaintiff filed a Response, Response Memorandum of Law, Response to the Defendant's Statement of Undisputed Facts, his own Statement of Additional Facts, and his own evidentiary materials.

(Doc. Nos. 19–22.) Liberty filed a Reply and a Response to the Statement of Additional Facts. (Doc. Nos. 23–24.)

## II.        STANDARD OF REVIEW—RULE 56

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations— that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## III.    DISCUSSION

In support of its Motion for Summary Judgment, the defendant anticipates that the plaintiff will argue that (1) he did not advise Liberty on July 22, 2019 that the Property was vacant; (2) the Property was occupied in July and August 2019; and (3) Liberty cannot meet its burden of proving that the Property was vacant or otherwise prove an increased risk of loss posed by the Property. Liberty contends that these positions "ignore the proof and applicable law." (Doc. No. 17, at 11.) Liberty argues more specifically that (1) the breach of contract claims fail, because Liberty properly cancelled the Policy in reliance on the plaintiff's statement that the Property was vacant and/or on his failure or refusal to produce a copy of the lease, both of which constitute proof of a "substantial change in risk"; (2) under Tenn. Code Ann. § 56-7-103, Martin's "withholding of information during the renewal application process serves to defeat his claim for coverage" (Doc. No. 17, at 18); (3) the plaintiff's statement on July 22, 2019 that the Property was vacant, when he knew otherwise, was made with actual intent to deceive, and such material misrepresentation constitutes "concealment or fraud" under the Policy and operated to "void" the entire Policy; (4) the plaintiff is estopped from overturning the cancellation of the Policy following the Loss, because he was on notice of—and had ample opportunity to avoid—the cancellation; and (5) the plaintiff's bad faith claim fails, both because Liberty did not breach the Policy and because the plaintiff cannot show that there were "no legitimate grounds for disagreement about the coverage of the insurance policy" (Doc. No. 17, at 23 (quoting *Fulton Bellows, LLC v. Fed. Ins. Co.*, 662 F. Supp. 2d 976, 996 (E.D. Tenn. 2009)).) The defendant also contends that no enforceable contract was in existence, because the plaintiff accepted the $707 refund of the unused portion of the premium in September 2019, meaning that he did not pay for coverage after that date.

In response, the plaintiff argues that Liberty is not entitled to summary judgment, because: (1) Liberty breached the Policy by cancelling it mid-term without cause and in violation of its own

Policy provisions; (2) the question of whether the plaintiff received actual notice of cancellation is a question of fact for the jury; (3) there is no evidence that the plaintiff intentionally misrepresented or concealed material facts pertaining to the Policy; (4) the plaintiff has stated a *prima facie* case of bad faith denial of a claim under Tenn. Code Ann. § 56-7-105(a); and (5) the question of whether Liberty acted in bad faith is a question for the jury. Regarding the issue of consideration, the plaintiff contends that he submitted payment and was unaware that Liberty had refunded it until after the tornado struck the Property, as a result of which there was no meeting of the minds as to Liberty's unilateral termination of the Policy.

### A.      Preliminary Issues

Certain of the defendants' arguments are readily resolved. First, it is abundantly clear, Liberty's arguments to the contrary notwithstanding, that Tenn. Code Ann. § 56-7-103 has no application here. That statute pertains to written or oral misrepresentations made "in the negotiations of a contract or policy of insurance, or in the application for contract or policy of insurance." *Id.* The alleged misrepresentation did not take place in an application for a policy, nor did it take place during the course of "negotiations," because there were no negotiations in connection with the renewal—Liberty offered a take-it-or-leave-it renewal premium. Moreover, the type of misrepresentation alleged in this case did not *increase* the risk of loss in the sense contemplated by the statute. If, for example, the plaintiff had falsely informed Liberty that the Property was occupied when it was, in fact, vacant, that type of misrepresentation would have increased the risk of loss. Telling Liberty the property was vacant when it was actually occupied, in contrast, did not *increase* the risk of loss. Section 56-7-103 does not apply.

Second, the defendant is not entitled to summary judgment on the basis of its argument that Martin's statement on July 22, 2019 that the Property was vacant, when he knew otherwise, was made with actual intent to deceive and that such material misrepresentation qualifies as

"concealment or fraud" under the Policy sufficient to "void" the entire Policy. While it seems to be undisputed that Liberty's representative understood Martin as saying that the Property was vacant, there is a question of fact as to what he actually said and no evidence that he intentionally misrepresented the status of the Property. And, again, a statement that the Property was unoccupied when it was actually occupied would not serve to increase the risk of loss in a manner that would justify voiding the Policy.

### B. Breach of Contract Claims

Liberty maintains that it is entitled to summary judgment on the breach of contract claims (for denial of the claim and for unilaterally and wrongfully terminating the Policy) because it properly cancelled the Policy in reliance on the plaintiff's statement that the Property was vacant and was justified in not reinstating it based on the plaintiff's failure or refusal to produce a copy of the lease. For his part, Martin counters that Liberty breached the Policy by cancelling it mid-term without cause and in violation of its own Policy provisions and that the question of whether he received actual notice of cancellation is a question of fact for the jury.

The latter argument is without merit in light of the Policy provision that clearly provides that "[p]roof of mailing [a cancellation notice] will be sufficient proof of notice." (Doc. No. 1-1, at 45.) There is no dispute that Liberty has provided adequate proof of notice. Neither Tennessee nor the Policy requires mailing by certified mail, and Liberty is not obligated to prove the plaintiff's receipt of notice. *Accord Blurton v. Grange Ins. & Cas. Co.*, 159 S.W.3d 1, 8 (Tenn. Ct. App. 2004) ("Moreover, . . . it is not necessary that the [plaintiffs] have actually received the notice of cancellation in order for it to be effective." (citing *Quintana v. Tenn. Farmers Mut. Ins. Co.*, 774 S.W.2d 630, 632–33 (Tenn. Ct. App. 1989))); *see also Calvert Fire Ins. Co. v. Am. Nat'l Bank & Trust Co.*, 438 S.W.2d 545, 545 (Tenn. 1969) (holding that, where the fact of mailing is

undisputed, it is not necessary for notice actually to be received in order for the cancellation to be effective (citing *Cherokee Ins. Co. v. Hardin*, 302 S.W.2d 817 (Tenn. 1957)).

Otherwise, Martin's opposition to Liberty's Motion for Summary Judgment on the breach of contract claims is premised on the proposition that, because the Property was never *actually* vacant, Liberty did not have a valid basis under the terms of the Policy itself for cancelling the Policy and was never justified in requiring proof of occupancy beyond the plaintiff's simple statement that the Property was occupied.

Under Tennessee law,

[i]nsurance contracts are subject to the same rules of construction as any other contract. The plain language of the policy should be given its ordinary meaning, and the parties' intent is paramount. The policy should be interpreted fairly and reasonably, giving the language of the policy its common, ordinary meaning. Any ambiguity in the policy should be construed against the party who drafted it, the insurance company. When an insurer wishes to rely upon the cancellation of a policy by mailing a notice of cancellation, it must show that it complied strictly with the policy's requirements. Strict compliance is required so that the insured will have time to obtain other insurance or protection.

*Blurton*, 159 S.W.3d at 7–8 (internal citations and quotation marks omitted).

As set forth above, the Policy itself provided Liberty only two grounds for unilaterally cancelling the Policy: (1) a "material misrepresentation of fact which, if known to us would have caused us not to issue the policy" and (2) "[i]f the risk has changed substantially since the policy was issued." (Doc. No. 1-1, at 45–46.) The first ground does not apply because, even assuming that the plaintiff "misrepresented" that the Property was vacant when it was really occupied, Liberty has not shown that this type of misrepresentation would have caused it not to issue the Policy. Rather, the question is whether the "risk" in insuring the Property had substantially increased since Liberty first issued the Policy in 2016. Under Tennessee law, "[i]f an insurer seeks to avoid liability on the theory of an increase in risk, the burden is on the insurer to prove the

increase in risk." *Reed v. Tenn. Farmers Mut. Ins. Co.*, 483 S.W.2d 721, 725 (Tenn. Ct. App. 1972).

To be clear, the plaintiff does not assert that the defendant's Motion for Summary Judgment should be denied on the basis that there is a material factual dispute as to whether the plaintiff actually told Liberty that the Property was vacant. He does not appear to dispute that his statement, whatever it actually was, was equivocal and that Liberty *understood* him to say that the Property was vacant. Instead, the plaintiff, pointing to Liberty's own witnesses' testimony, argues that Liberty did not have a valid basis for cancelling the Policy, because there is no dispute that the Property was never *actually* vacant, regardless of whether Liberty legitimately believed that it was (in reliance on the plaintiff's own confused and confusing communications with it). The plaintiff also contends that Liberty did not have the right under the Policy to demand proof of occupancy, once the plaintiff told its representatives in subsequent conversations that the Property was not actually vacant.

The court is not persuaded. Liberty was entitled to rely on the plaintiff's statement that his rental Property was vacant, particularly given that this statement was against the plaintiff's interest. The plaintiff's apparent contention that Liberty had an independent obligation to verify the truth of Martin's statement that the Property was vacant is untenable, and the plaintiff has not presented any caselaw to support it. Moreover, there is simply no dispute that a vacancy would substantially increase the risk associated with insurance coverage of a rental property. *See, e.g.*, *Catalina Enters., Inc. Pension Tr. v. Hartford Fire Ins. Co.*, 67 F.3d 63, 66 (4th Cir. 1995) ("The reason for vacancy exclusions in fire insurance policies is obvious: empty buildings without occupants or activities pose increased fire risks."). In other words, the court finds that the plaintiff's statement that the Property was vacant, standing alone, was sufficient to permit Liberty to conclude that the

risk in insuring the Property had substantially increased since the date the Policy was issued in 2016. The fact that the Property was not *actually* vacant, as the plaintiff argues, is immaterial. In light of the plaintiff's equivocations and Liberty's undisputed understanding that the Property was vacant, Liberty was within its rights to cancel the Policy under the "substantial change in risk" cancellation provision of the Policy.

From that conclusion follow several others. Because Liberty had the right to cancel the Policy, it also had the right to define the conditions under which it would agree to reinstate the Policy. On that basis, the court rejects as irrelevant the plaintiff's insistence that the Underwriting Guidelines describing the documentation required from an owner in response to a vacancy did not apply to him, because they only apply to "New Business/Non-Renewal Inspection Cancellations." (*See* Doc. No. 20-13, at 3.) Further, although the plaintiff claims now that he sent Liberty a copy of his written lease with Evelyn McCarty, there is no dispute that, in his Department of Insurance Complaint, he claimed that, although Liberty had "demanded a copy of [his] lease," he "had no written lease at that time," so he did not comply with the demand. (Doc. No. 16-2, at 64.) There is also no dispute that (1) the plaintiff has not provided proof of mailing; and (2) Liberty did not receive a copy of the lease until sometime well after the Policy terminated effective September 4, 2019.

In sum, Liberty properly cancelled the Policy under its terms, provided adequate notice to Martin of cancellation, and refunded the prorated unused portion of the premium. It did not breach the contract of insurance by cancelling it. Moreover, because the Policy was no longer in effect at the time Martin's Loss occurred, Liberty did not breach the Policy by denying the claim. Liberty, therefore, is entitled to summary judgment on the plaintiff's breach of contract claims.

### C.     Bad Faith

Because Liberty is entitled to summary judgment on the plaintiff's breach of contract claims, it is also entitled to summary judgment on the bad faith claim. Even if it were not, however, it would still be entitled to summary judgment on the bad faith claim.

Under Tennessee law, when an insurer refuses to pay a loss in bad faith, the insured may receive up to 25% of the liability in addition to the loss. Tenn. Code Ann. § 56-7-105(a). To state a bad faith claim, a plaintiff must show: (1) the policy of insurance has, by its terms, become due and payable; (2) a formal demand for payment has been made; (3) the insured has waited 60 days after making demand before filing suit (unless there was a refusal to pay prior to the expiration of the 60 days); and (4) the refusal to pay was made in bad faith. *Patterson v. Shelter Mut. Ins. Co.*, No. M2014-01675-COA-R9-CV, 2015 WL 5320231, at *7 (Tenn. Ct. App. Sept. 11, 2015). At trial, plaintiff would bear the burden of proving that Defendants refused to pay in bad faith. *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 378 (6th Cir. 2007).

While the plaintiff is clearly correct that he stated a *prima facie* claim of bad faith in his Complaint sufficient to have withstood a motion to dismiss under Rule 12, this motion is before the court under Rule 56, and the plaintiff must have actual proof of bad faith to survive summary judgment. And a bad faith claim for a refusal to pay cannot be sustained "when the insurer's refusal to pay rests on legitimate and substantial legal grounds." *Tyber v. Great Cent. Ins. Co.*, 572 F.2d 562, 564 (6th Cir. 1978); *accord Williamson*, 481 F.3d at 378; *Ginn v. Am. Heritage Life Ins. Co.*, 173 S.W.3d 433, 443 (Tenn. Ct. App. 2004). "The question of an insurance company's bad faith is for the jury if from all of the evidence it appears that there is a reasonable basis for disagreement among reasonable minds as to the bad faith of the insurance company in the handling of the claim." *Johnson v. Tenn. Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 371 (Tenn. 2006).

In this case, there are no facts from which a reasonable jury could conclude that Liberty acted in bad faith in denying the claim, when it had indisputably cancelled the Policy six months prior to the plaintiff's Loss, provided notice of such cancellation, and issued a prorated refund of the unused portion of the premium, which amounted to nearly all of it. Even if the plaintiff were able to prove that the cancellation was in violation of the Policy's terms, he cannot show that Liberty's reliance on that prior cancellation was in bad faith.

## IV.   CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment will be granted. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge